Robinson *v.* Fiske.

━━━━━

HENRY K. ROBINSON *versus* BENJAMIN FISKE *&* al.

Every contract must have an interpretation governed in some measure by the subject matter to which it relates; and at the same time, with reference to any *known usage* connected therewith.

Where the plaintiff entered into a written contract with the defendants to cut and haul sound timber, suitable for boards, from their land to the river, to be by them run from thence and sawed at their mills, at an agreed price per thousand feet, "the timber to be scaled," before put into the river, by one of certain persons named, to be selected by them; such survey, no fraud appearing, is conclusive between the parties to ascertain the amount to be paid for cutting and hauling; although it might appear by a re-survey at the mills, that the first surveyor made an over estimate, caused by not making a sufficient allowance for defective timber.

THIS was an action of assumpsit in which the plaintiff claimed to recover an alleged balance for cutting and hauling a quantity of pine logs from defendants' township, under a written contract dated October 12, 1841.

At the trial, before WHITMAN C. J. the plaintiff, in support of his claim, called Daniel Davis, who testified, that he went on in April, 1842, for the purpose of scaling all the logs except what have been scaled by O. W. Gilman, that he had a letter of instructions from the defendants, directing him to scale and examine each log, and that no logs would be paid for unless he made an actual survey; that Robinson was present and concurred in the instructions. The plaintiff then read this letter, which may be referred to by either party. Davis then testified, that by his return of the scale, there were 2657,370 feet of pine timber scaled by him, and 20,856 feet of spruce; that he did not examine and make an actual survey of all the logs, as owing to the situation and manner in which the logs lay, he could not at the time get at them; that upon one landing out of 134 logs he did not scale more than 15 or 20 logs; that he saw a great many unsound logs which were unfit for

boards; that out of the first 184 logs he scaled, he threw out 27 logs; and that in making up his scale, when he could not get at the logs to make an actual survey, he made an average of the quantity of feet.

O. W. Gilman, called by the plaintiff, testified that on the North Yarmouth tract he scaled 586 logs; that out of that number he threw out 63 logs as unfit for boards, making in all as scaled, and returned by him, 171,890 feet, and that there were logs at that landing so covered with snow and ice that he could not and did not scale them. The plaintiff also read the deposition of P. Hildrith; and here rested his case.

The defendants' counsel then offered to prove by those who drove and manufactured the lumber and others, that all the logs, sound or unsound, cut by the plaintiff, except 10 or 20 logs, were run to the defendants' mills in Milford the same spring, and when they came to saw and manufacture the logs into boards, there were over six hundred thousand feet which had been included in the scale and measurement of the scalers, that were unsound and totally unfit for boards; that this quantity was in addition to the unsound and rotten logs which were thrown out by the scalers or which by agreement they had a right to scale; and that there was a loss to the defendants of more than the balance claimed by the plaintiff in this action, and which resulted from the great number of unsound and unfit logs cut and hauled by the plaintiff; and that the defendants had already paid more than there would be due under the contract for sound pine timber, suitable for boards, actually cut and hauled, by the plaintiff; which was not admitted.

The writ, contract and deposition of Parlin Hildrith may be referred to by either party.

Upon this evidence the counsel for the defendant consented that a default should be entered; and if the evidence offered should have been admitted, and the action could be maintained, the default was to be taken off.

No copy of the writ, deposition or letter referred to, came into the hands of the reporter.

The following is a copy of the contract: —

" This memorandum of agreement by and between Fiske & Bridge on the one part, and Henry K. Robinson on the other part, witnesseth ; that the said Robinson hereby agrees to go on to the North Yarmouth tract of land, so called, and on township, number two in the fourth range, the coming logging season with six good six ox teams, well manned, and there cut and haul through the logging season the sound pine timber upon said tracts, which may be suitable for boards, and deliver the same on good landings on the Macwancock stream and Gullifer brook, so called ; and the logs are to be marked F. $\times$ B. and water marked, and to be cut into board logs in a saving and prudent manner, and suitable for running, and for sawing into boards.

" And for the payment of the above cutting and hauling by the said Henry K. the said Robinson is to receive two dollars and fifty cents per thousand feet, board measure.

" It is further mutually agreed by the parties that said Robinson shall receive his pay for the above as follows, viz. Three hundred dollars in the month of November next, with interest to the fifteenth of May next ; three hundred dollars in the month of January next, with interest to the fifteenth of May next ; and the provisions, goods and grain necessary for the teams and men, without interest ; and the balance, after deducting the money and supplies, is to be paid, one half of it by an acceptance at sixty days from the first of May next, and the other half, on the first of November next, 1842.

" It is further understood by the parties, that no timber or logs shall be landed or hauled on to the streams above the landings made by Willey and Hathornes & Co. during the logging season of 1840 and 1841. It is further understood, that the timber is to be scaled by Messenger Fisher, O. W. Gilman, or by Daniel Davis, as Fiske & Bridge may elect, or by some other man to be chosen by the parties. It is further agreed by the parties, that should there be any hollow butted logs cut and hauled by said Robinson, with eight inches of sound timber around the hollow, such logs are to be scaled and a reason-

able allowance is to be made by the scaler. And said Robinson is not to cut and haul any hollow butted logs with less than eight inches of sound timber around the hollow."

"Milford October 12, 1841.    " Fiske & Bridge,
                                     " Henry K. Robinson.
"Witness, Chas. S. Bridge."

The case was fully argued by

*Kent & M. L. Appleton,* for the defendants — and by

*J. Appleton,* for the plaintiff.

The opinion of the Court was drawn up by

WHITMAN C. J. — A contract between the plaintiff and the defendants, was entered into in October, 1841, in which the plaintiff agreed to cut and haul timber for the defendants, from their land, during the succeeding logging season, at a certain rate per thousand feet, board measure; and this action is brought to recover a balance, alleged by the plaintiff to be due to him for his services under that contract. By the terms of the contract the plaintiff was to employ six good six ox teams in the business; and was to cut and haul sound pine timber, suitable for boards; and should there be any hollow butted logs cut, having eight inches of sound timber around the hollow, they were to be scaled; and a reasonable allowance made by the scaler on account of the hollow. Under such contracts it is understood, that a surveyor shall be agreed upon to ascertain the quantity of boards, which logs, so cut and hauled, will make. It is obvious that nothing like absolute certainty can be expected to be the result of such a survey. Surveyors are expected to be men of experience in that line; and, by the use of their scale and judgment together, to be able to approximate, in ascertaining the quantity, sufficiently near the truth for the purpose in view. In this case three such surveyors were named in the contract; and the defendants were to select either of them, at their pleasure, to ascertain the quantity cut and hauled; and payment was of course to be made accordingly. The defendants selected one of the individuals named, who surveyed and certified his doings to

the amount of 171,890 feet. He not being able to survey the rest, the defendants selected another of those individuals, who surveyed, or certified that he surveyed, to the amount of 2,657,330 feet of pine, and 26,856 feet of spruce timber. The plaintiff's claim is predicated upon these certificates, made under his contract.

The defence set up, was, that over six hundred thousand feet of the timber was unsound, and unfit for boards; and proof was offered to be made that the whole, with the exception of some ten or twenty of the logs, were run to the defendants' mills; and, in manufacturing them into boards, such appeared to be the case. This proof was considered by the Court at the trial as inadmissible; and the question, whether it was so or not, is now for the consideration of the Court. If it was admissible, the default, which was entered, under the ruling of the Court, is to be taken off, and the action to stand for trial; otherwise judgment is to be entered thereon.

It is insisted, on the part of the defendants, that the surveyors were agreed upon between the parties merely to ascertain, by admeasurement, the precise quantity, that, according to such measurement, each log would make, and that they were not to exercise their judgments, except in one event, viz: when a log was found with a hollow at the butt, having eight inches in thickness of sound timber around the hollow. If the defendants were right in this position the proof proposed may have been admissible. On the other hand, it is urged, that the object of agreeing on the surveyors was to settle conclusively the amount of the timber cut, and so to what, according to the rate agreed upon, the plaintiff should be entitled to receive for his services.

Every contract must have an interpretation, governed in some measure by the subject matter to which it relates; and, at the same time, with reference to any known usage connected therewith. If a surveyor be hired to survey a lot of boards it is expected he will do something more than merely ascertain the number of feet each board may contain. He would be ex-

pected to ascertain whether they were of one class or another; whether they were clear, refuse or merchantable; and if a board were split or rotten, for some small space on one side, to make an allowance, such as would bring it within one of the known classes; or, if it were so badly defective as to be useless as a board, to reject it altogether. This results from the nature of the employment; and is in accordance with a well known usage.

The business of getting lumber, or logging, as it is more familiarly called, is a business somewhat peculiar in its nature, especially when carried on remote from settlements, and in large operations, as was the case in this instance. It is to be carried on in the winter time, when snow is accumulating which oftentimes becomes of great depth. The owner of the timber is seldom expected to be present. He may have permitted it to be cut upon shares, or at so much per M. or he may, as in this instance, have hired it cut and hauled. In every such case a surveyor or scaler, as he is sometimes called, from his using a scale, must be selected to ascertain the quantity cut and hauled out to a landing, where, in the spring, when freshets arise, it is to be turned in, and be set afloat to go to its place of destination. In cutting the timber mistakes are inevitable in reference to its quality. It may, till felled, have the appearance of being sound, and in cutting it may prove to be very defective. The surveyors cannot be expected to be present during the whole operation; even at the landing places. In this instance the surveyor, who surveyed the great bulk of the timber, was not sent on by the defendants, as appears by their letter of instructions which is filed in the case, till the operations of cutting and hauling must have about closed. The logs in such cases must be expected to be piled one upon another, to a considerable height, and be often imbedded in a great depth of snow. Yet a survey is to be made of them. This is done sometimes to enable the proprietor to make sale of them by the survey bill; at others, to enable the proprietor to know how much has been cut and

hauled, for the double purpose of knowing what he must pay for the labor ; and for selling it by the survey bills. This is the well known course of such business.

Under the contract the plaintiff was to cut and haul sound timber, suitable for boards ; and it was to be surveyed by one of three individuals, to be appointed by the defendants ; who did not want the timber in order to sell it at the landings ; they wanted it for their own use ; it was to be cut from their own land. What must they have understood? They must have known the course of such business ; they must have known that, to cut timber utterly free from defects, situated as this was, would be impracticable. Suppose a tree were felled, and thereupon found to be defective to some extent, yet not so as not to be of some considerable value for board logs, did the defendants mean, that it should be left to rot upon the ground ? or did they mean that it should be hauled, and, by the surveyor, be estimated according to what it would make of sound timber ? That they must have intended the latter is certainly the most rational conclusion, if they regarded their own interest, as we may reasonably suppose they did.

Besides, the plaintiff was to cut and haul sound timber, suitable for boards. What would lumbermen understand by sound timber suitable for boards ? Would it be that it was to be timber entirely free from defects ? Or would they take it to mean so sound as to be profitable to work into boards ? It would seem that whatever of it was sound, if enough of it were so, to make it profitable for boards, that it would be deemed to be sound timber, suitable for such purpose, and this we think must be a fair interpretation of the contract.

What then must have been the duty of the surveyors ? It is well known that timber may be crooked ; it may not be exactly round at each end. These, also, would prevent mathematical precision in ascertaining the quantity of boards it would make. These, as well as defects, must call for the exercise of the judgment of the surveyor in ascertaining what quantity of boards the timber would make. Again, it can hardly be doubted, that the parties, in making their contract,

must have had in view the situation in which the lumber would be found, at the time when the survey would be expected to be made; the depth of the snows; the manner of piling it up, &c. and that they must have expected such course would be adopted, as had been usual in such cases, in arriving at a knowledge of the quantity of timber. On the whole, it cannot be reconciled to reason, to suppose that the surveyors, in this instance, were appointed to make their survey, by merely applying the scale, and making their calculations therefrom, with the exception of the case of a hollow butted log. Purchasers by their certificates never understood this to be their course of proceeding. They suppose, unquestionably, that the quantity is ascertained by the use of the scale, and of a sound judgment as to defects, crooks and all the other incidents connected with such business. The surveyors, in this very case, guided, no doubt, by their former habits, exercised their judgments, as they testified, in rejecting many of the logs as unsuitable to make boards; and of course included all that they judged suitable for that purpose; making due allowances in all proper cases, it may be presumed.

The parties, in making their contract, have not intimated an intention, that the surveyors agreed upon should proceed otherwise, in reference to the timber, than had been customary in other cases: and it is difficult to entertain a doubt, that they contemplated being bound by their doings. The only object, as between them, of having a survey made, was to furnish the data upon which to calculate the amount, according to the terms of the contract, which the plaintiff should receive for his services. We think, therefore, that the report of the surveyors, in the absence of fraud, or any thing tending to show unfairness on the part of the plaintiff in procuring the result, should be conclusive between the parties; and that the evidence offered to impeach it was inadmissible.

*Judgment on the default.*